# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
### Judge Nina Y. Wang

Civil Action No. 23-cv-00245-NYW-STV

MICHELLE FARIS,

       Plaintiff,

v.

SOUTHERN UTE INDIAN TRIBE,
RED WILLOW PRODUCTION CO., and
GROWTH FUND MANAGEMENT COMMITTEE,

       Defendants.

---

## ORDER ON MOTION TO DISMISS

---

This matter is before the Court on Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1) for Lack of Subject Matter Jurisdiction (the "Motion" or "Motion to Dismiss") [Doc. 21]. The Court has reviewed the Motion, the Parties' briefing, and the applicable case law, and concludes that oral argument would not materially assist in the resolution of the Motion. For the reasons set forth in this Order, the Motion to Dismiss is respectfully **GRANTED**.

## BACKGROUND

Plaintiff Michelle Faris ("Plaintiff" or "Ms. Faris") previously worked for Red Willow Production Company ("Red Willow"), a private oil and gas company and a division of the Southern Ute Indian Tribe Growth Fund ("Growth Fund"), which is an internal organizational component of the Southern Ute Indian Tribe ("Tribe"). [Doc. 1 at ¶¶ 1–2, 5; Doc. 21 at 5; Doc. 21-7 at 2].[1]

---

[1] As explained below, the Court may consider extraneous documents when ruling on the Motion to Dismiss.

Ms. Faris worked for Red Willow as a contract employee from 1995 to 1996 and as a full-time employee from December 13, 1996 to November 18, 2021.  [Doc. 1 at ¶ 2].

As an employee, Ms. Faris participated in an employee benefits plan called the Long Term Incentive Plan ("LTIP").  [*Id.* at ¶¶ 1, 22, 31].  Pursuant to the terms of the LTIP, the Growth Fund Management Committee (the "Committee") maintains a bookkeeping account for each LTIP participant and, each year, may credit each participant's account in an amount equal to the annual bonus earned by the participant that year.  [Doc. 21-13 at §§ 2.1, 2.4, 4.1].  Starting on the employee's fourth year of participation in the LTIP, the employee receives a yearly distribution payment in an amount equal to 20% of the employee's then-current account balance.  [*Id.* at § 5.2].  The percentage used to calculate the employee's distribution payment increases incrementally based on the employee's age/and or years of service with the Company,[2] increasing to 35% when the participant reaches age 50 or completes 20 years of service with the Company; to 50% when the participant reaches age 55 or completes 25 years of service with the Company; and to 100% when the participant reaches age 60 or completes 30 years of service with the Company.  [*Id.*].

In 2020, Ms. Faris began having conversations with her colleagues about her plans to retire at the end of 2022, the year in which she was set to turn 55 years old and reach 25 years' tenure at Red Willow.  [Doc. 1 at ¶¶ 32, 34].  Based on both her age and her years of experience, Ms. Faris's yearly distribution payment was set to increase in 2022 to 50% of her account balance, up from 35%.  [*Id.* at ¶ 33; Doc. 21-13 at § 5.2].  Then, on November 18, 2021, "without any warning, advanced notice, or any prior discipline," Ms. Faris was terminated from her employment "based on entirely false allegations against her."  [Doc. 1 at ¶ 42].  Ms. Faris alleges that Defendants

---

[2] The LTIP defines "Company" as "the Southern Ute Indian Tribe Growth Fund and its business enterprises," [Doc. 21-13 at § 2.5], and the Parties agree that this encompasses Red Willow, *see* [Doc. 1 at ¶ 5; Doc. 21 at 5–6].

"fabricated a for-cause termination" to avoid paying her the increased LTIP distribution payment that she would have received in 2022. [*Id.* at ¶¶ 1, 46–49].

Ms. Faris initiated this lawsuit on January 27, 2023 pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). *See generally* [*id.*]. She asserts that the LTIP "is a Covered plan under ERISA because it is . . . an Employee Benefit Pension Plan," and thus, the LTIP is "subject to ERISA governance." [*Id.* at ¶¶ 20, 30]. She raises three claims pursuant to ERISA against Defendants: (1) one claim alleging wrongful discipline, wrongful discharge, and discrimination in violation of 29 U.S.C. § 1140; (2) one claim alleging interference with protected rights in violation of 29 U.S.C. § 1140; and (3) one claim alleging a breach of fiduciary duty based on the duty to disclose a plan summary under 29 U.S.C. § 1024(b)(4). [*Id.* at ¶¶ 57–82].

Defendants filed the instant Motion to Dismiss on March 24, 2023. [Doc. 21]. Therein, they argue that this Court lacks subject matter jurisdiction over Plaintiff's claims because (1) the LTIP "is a bonus program that is excluded from ERISA coverage" and thus, there is no basis for federal jurisdiction, [*id.* at 8], and (2) the Tribe's sovereign immunity, which extends to Red Willow and the Committee, bars any claim based on claims that unwarranted terminations result in ineligibility for non-ERISA incentive bonuses, [*id.* at 13–14].[3] The Honorable Scott T. Varholak permitted the Parties to conduct limited jurisdictional discovery, but stayed most discovery in this case pending the resolution of the Motion to Dismiss. [Doc. 30 at 1]. Per the

---

[3] While Plaintiff argues that Congress expressly abrogated tribal immunity when it amended ERISA in 2006, *see* [Doc. 39 at 10–11], she makes no other argument that all Defendants have waived their sovereign immunity, *see generally* [*id.*]. Nor does she identify any other basis for this Court's subject matter jurisdiction in the Complaint. *See generally* [Doc. 1]. Accordingly, Plaintiff is unable to carry her burden of establishing that Defendants have waived their sovereign immunity based on any other legal theory aside from ERISA, and thus, the analysis of this Order is focused upon whether ERISA confers this Court subject matter jurisdiction over Plaintiff's alleged causes of action.

Parties' stipulated briefing schedule, Plaintiff responded in opposition to the Motion on September 1, 2023, [Doc. 39], and Defendants replied on October 2, 2023, [Doc. 45]. The Court considers the Parties' arguments below.

## LEGAL STANDARD

The question of whether a plan is governed by ERISA is a mixed question of fact and law. *See Peckham v. Gem State Mut. of Utah*, 964 F.2d 1043, 1047 n.5 (10th Cir. 1992). The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has not specifically addressed whether the issue is jurisdictional or substantive. *See Potts v. CitiFinancial, Inc.*, No. 11-cv-02177-REB-BNB, 2011 WL 6021035, at *1 (D. Colo. Dec. 5, 2011). Courts within the Tenth Circuit have found that the issue of whether an ERISA plan exists is intertwined with the merits of the case, and thus address the issue in the context of Rule 12(b)(6) or summary judgment. *See, e.g., id.* (considering the matter under Rule 12(b)(6)); *Herring v. Oak Park Bank*, No. 95-2623-JWL, 1996 WL 377088, at *2 & n.2 (D. Kan. June 24, 1996) (addressing the issue under Rule 12(b)(6)).

Here, neither side advocates for consideration under Rule 12(b)(6) of the Federal Rules of Civil Procedure or conversion to a motion for summary judgment. Instead, all Parties appear to proceed pursuant to Rule 12(b)(1). *Compare* [Doc. 21 at 7], *with* [Doc. 39 at 2–3]. This Court follows the Parties' lead and proceeds under Rule 12(b)(1).

Under Rule 12(b)(1), a court may dismiss an action for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Dismissal under Rule 12(b)(1) is not a judgment on the merits of the plaintiff's claim. Instead, it is a determination that the court lacks authority to adjudicate the matter." *Creek Red Nation, LLC v. Jeffco Midget Football Ass'n, Inc.*, 175 F. Supp. 3d 1290, 1293 (D. Colo. 2016). "A court lacking jurisdiction cannot render judgment but must dismiss the cause

at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013). The burden of establishing jurisdiction rests with the party asserting jurisdiction. *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017).

Attacks on subject matter jurisdiction may take two different forms—a facial attack or a factual attack—which implicate different analytical frameworks. The Tenth Circuit has explained that

> [m]otions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may take one of two forms. First, a party may make a facial challenge to the plaintiff's allegations concerning subject matter jurisdiction, thereby questioning the sufficiency of the complaint. In addressing a facial attack, the district court must accept the allegations in the complaint as true. Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. In addressing a factual attack, the court does not presume the truthfulness of the complaint's factual allegations, but has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).

*United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001) (quotation and citations omitted)).

Defendants mount a factual attack on the Court's subject matter jurisdiction. [Doc. 21 at 7]. Thus, the Court does not presume the factual allegations in the Complaint are true and may consider evidence to resolve disputed jurisdictional facts. *Rodriguez Aguirre*, 264 F.3d at 1203. "[T]he court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter jurisdiction does or does not exist." *Brito v. Denver Convention Ctr. Hotel Auth.*, No. 20-cv-02719-PAB-KMT, 2021 WL 4149619, at *2 (D. Colo. Sept. 13, 2021).

## ANALYSIS

ERISA was enacted to, *inter alia*, "protect . . . the interests of participants in employee benefit plans and their beneficiaries." 29 U.S.C. § 1001(b). Under ERISA, it is unlawful to

discharge, discipline, or discriminate "against a participant or beneficiary for exercising any right to which [s]he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." *Id.* § 1140.

Relevant here, "employee benefit plan" includes "an employee pension benefit plan." *Id.* § 1002(3). The terms "employee pension benefit plan" and "pension plan" are defined as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program–
>
>> (i)   provides retirement income to employees, or
>>
>> (ii)  results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

*Id.* § 1002(2)(A). The Secretary of Labor has promulgated regulations to "clarif[y] the limits of the defined terms 'employee pension benefit plan' and 'pension plan.'" 29 C.F.R. § 2510.3-2(a). The regulations provide that the terms "employee pension benefit plan" and "pension plan" do not include "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." *Id.* § 2510.3-2(c).

Defendants contend that the Court lacks subject matter jurisdiction over Plaintiff's claims because the LTIP is not subject to ERISA, such that there is no federal statutory basis for jurisdiction over Plaintiff's causes of action. [Doc. 21 at 8]. More specifically, they contend that that based on the LTIP's terms, purpose, and operation, the LTIP offers employee participants an

incentive to remain with the Company, as opposed to retirement income. [*Id.* at 11–12]. For this reason, Defendants assert that the LTIP is a "bonus program" that does not systematically defer payments to the termination of covered employment or beyond, and thus, is excluded from ERISA coverage under 29 C.F.R. § 2510.3-2(c). [*Id.* at 9–13].

Though not entirely clear, Ms. Faris appears to forward a few different theories that the LTIP is covered by ERISA and thus, provides this Court with subject matter jurisdiction over her claims. First, Ms. Faris asserts that "[t]he relevant question before the Court to determine whether it has jurisdiction over this matter is whether the LTIP 'provides retirement income' pursuant to 29 U.S.C. § 1002(2)(A)[(i)]." [Doc. 39 at 4]. But Ms. Faris never addresses § 1002(2)(A)(i) directly—indeed, beyond a single mention of the subsection, it is never cited again. *See generally* [*id.*]. Because Plaintiff bears the burden of establishing subject matter jurisdiction and she fails to develop this argument, this argument is deemed waived. *See Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002) ("[I]ssues will be deemed waived if they are not adequately briefed.").

Second, Ms. Faris generally argues that the LTIP is "not a bonus program," but rather acts as a "traditional retirement account" because the LTIP account is made up of amounts equal to the participant's bonus, plus accrued interest and "deemed earnings." [Doc. 39 at 8–9]. Because the participant does not have the discretion and ability to remove funds whenever they desire, Plaintiff contends that the LTIP is not funded with bonuses, but rather is part of a participant's income that is being deferred for periods extending to the termination of covered employment or beyond. [*Id.* at 9]. Thus, she contends, it is covered by ERISA pursuant to § 1002(2)(A)(ii).

Third, to the extent that the LTIP is a bonus program, Plaintiff consistently argues that the LTIP systematically defers payment to the termination of covered employment and beyond, *see,*

*e.g.*, [Doc. 39 at 3, 4, 6, 9], and thus is subject to ERISA pursuant to 29 C.F.R. § 2510.3-2(c), *see, e.g.*, [*id.* at 4 ("*Because* the LTIP systematically defers payment to the termination of participants' employment, *much like* a pension program, it does not qualify for this exception to ERISA." (emphasis added))]; *see also* 29 C.F.R. § 2510.3-2(c) (excluding bonus payments from ERISA coverage "*unless* such payments are systematically deferred to the termination of covered employment or beyond" (emphasis added)).

Accordingly, the Court first determines whether the LTIP is properly characterized as a "traditional retirement account" or a "bonus plan," and, if so, the Court considers whether it is nevertheless governed by ERISA because it "systematically defers payments to the termination of covered employment and beyond" under 29 C.F.R. § 2510.3-2(c).

## I.    Characterization of the LTIP

The Parties' first dispute centers on whether the LTIP can be properly categorized as a bonus plan, or if it is, as Plaintiff suggests, a traditional retirement account.  Defendants contend that the LTIP is a bonus plan because, by its express terms and operation, it rewards employees and incentivizes them to stay employed with the Company and is not intended to provide retirement income.  [Doc. 21 at 9–12].  Ms. Faris disagrees and asserts that the LTIP is governed by ERISA because "its purpose is for participants to defer income 'for periods extending to the termination of covered employment or beyond.'"  [Doc. 39 at 5 (emphasis omitted) (quoting 29 U.S.C. § 1002(2)(A)(ii))].   She contends that the LTIP is not a bonus plan because LTIP participants receive a separate, distinct annual bonus that is unrelated to the LTIP and because Defendants' "thorough and detailed bonus policies never once mention the LTIP credit as being part of an employee's bonus."  [*Id.* at 7].  She also notes that participants' LTIP accounts accrue interest and earnings, "like other traditional retirement accounts."  [*Id.* at 8].  Plaintiff maintains

that the LTIP falls within the definition of an ERISA pension plan because LTIP distributions are "part of a participant's income that is being deferred until a later date" and are deferred "up to and beyond the termination of covered employment."  [*Id.* at 9–10].

To determine the nature of an employee benefits plan, courts look to the plan's express terms and the "surrounding circumstances."  *See* 29 U.S.C. § 1002(2)(A); *McKinsey v. Sentry Ins.*, 986 F.2d 401, 405 (10th Cir. 1993).  "A bonus plan excluded from ERISA will be found where payments made are not to 'provide retirement income,' but, instead, serve some other purpose, such as providing increased compensation as an incentive or reward for a job well done." *Hahn v. Nat'l Westminster Bank, N.A.*, 99 F. Supp. 2d 275, 279 (E.D.N.Y. 2000).

The Court first considers the LTIP's express purpose, which "is entitled to weight when determining the nature of the plan."  *Id.*  The express purpose of the LTIP—which stands for Long Term *Incentive* Plan—is to "reward and retain eligible employees of the Growth Fund and its business enterprises."  [Doc. 21-13 at § 1].  This suggests that the LTIP is a bonus or incentive plan, not a pension or retirement plan.  *See Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 435–36 (6th Cir. 2019) ("Generally, a bonus plan's terms state that the plan's express purpose is to pay a financial 'bonus' or 'additional incentive' to employees to encourage performance or retention."); *Killian v. McCulloch*, 850 F. Supp. 1239, 1246–47 (E.D. Pa. 1994) (finding that ERISA did not apply to a plan where "the Plan's express purpose was to provide employees with an incentive to remain with the Company by rewarding them with extra compensation based upon the Company's profits and its performance"); *Depew v. MNC Fin., Inc.*, 819 F. Supp. 492, 496 (D. Md. 1993) ("With a stated purpose of 'provid[ing] a means for the payment of *incentives* for the sustained achievement of the recovery objectives[,]' both plans expressly qualify as 'a bonus for work performed.'"  (emphasis in original) (citation omitted) (quoting 29 C.F.R. § 2510.3-2(c))).

Other terms in the LTIP support the conclusion that the LTIP's primary purpose is to retain employees and reward employees based on tenure, rather than provide retirement income.  As mentioned above, the Committee creates an account for all eligible employees and credits to the employee's amount an amount equal to the annual bonus earned by the employee that year.  [Doc. 21-13 at §§ 3.1, 4.1].  Beginning on the employee's fourth year of participation in the LTIP, on a designated date, the employee will receive a distribution payment in the amount of 20% of the employee's account balance.  [*Id.* at § 5.2].  While in-service distribution payments will not automatically render a benefits plan outside of ERISA's scope, *see Wilson*, 930 F.3d at 435, "courts interpreting the Section 1002(2)(A) definition of pension plan have determined that the critical factor in determining whether a deferred compensation plan is an ERISA pension plan is whether the plan allows payments to be made to employees during active employment," *Serio v. Wachovia Sec., LLC*, No. 06-cv-4681 (DMC), 2007 WL 2462626, at *4 (D.N.J. Aug. 27, 2007); *see, e.g.*, *Hagel v. United Land Co.*, 759 F. Supp. 1199, 1202 (E.D. Va. 1991) ("[ERISA] requires that a plan *generally* defer the receipt of income to the termination of employment."  (emphasis added)); *Albers v. Guardian Life Ins. Co. of Am.*, No. 98 CIV.6244 DC, 1999 WL 228367, at *3 (S.D.N.Y. Apr. 19, 1999); *Int'l Paper Co. v. Suwyn*, 978 F. Supp. 506, 511 (S.D.N.Y. 1997).

In addition, the distribution amount increases with seniority, and outside a limited number of exceptions, the LTIP states that the participant must be employed by the Company on the date the distribution payment is made to be eligible to receive the payment.  [Doc. 21-13 §§ 5.2, 5.5].  Indeed, the LTIP expressly states that

> [a]ll amounts in a Participant's Account shall remain subject to a substantial risk of forfeiture until the earlier of: (a) such time as such amounts are actually distributed to the Participant in accordance with Section 5.2 or (b) the date on which the Participant attains age 60 or completes 30 Years of Service (whichever occurs first) while still employed by the Company.

[*Id.* at § 5.1]. These terms incentivize employees to remain employed by the Company, both to receive their next distribution payment and to, over time, receive higher payments. Such provisions weigh in favor of finding that the LTIP is a bonus or incentive plan. *See Callan v. Merrill Lynch & Co.*, No. 09 CV 0566 BEN (BGS), 2010 WL 3452371, at *8 (S.D. Cal. Aug. 30, 2010) (finding that a benefits plan was a bonus program where it "[did] not have a retirement purpose" but instead was intended to "award top performing employees and provide financial incentive for employees to remain with [the company] and improve their performance there").

Ms. Faris nevertheless contends that the LTIP is not a bonus program because the participants receive other annual bonuses and the LTIP is not mentioned in Defendants' bonus policies. [Doc. 39 at 7–8]. But the fact that other annual bonuses are available "does not, by process of elimination, render the [LTIP] an ERISA plan," *Kaufman v. S & A Rest. Corp.*, No. 3:06-CV-2192-G, 2008 WL 2242621, at *6 (N.D. Tex. May 30, 2008), and the Court is not persuaded that the nature of the LTIP turns on its inclusion in the Company's written bonus policies, rather than the express terms of the LTIP.

Plaintiff also highlights the fact that the LTIP "is devoid of any participant discretion." [Doc. 39 at 9]. Indeed, the LTIP does not permit participants to choose the amount or timing of the distribution payments they receive. *See generally* [Doc. 21-13]; *see also* [*id.* at §§ 4.1, 5.2 (setting out express directives governing the payment amounts and the dates of distribution)]. But this fact does not persuade this Court that the LTIP is a retirement account, rather than a bonus plan. *See Houston v. Saracen Energy Advisors, LP*, No. H-08-1948, 2009 WL 890384, at *5 (S.D. Tex. Mar. 27, 2009) (plan was a "classic" bonus plan where the benefits "could be distributed before [the participant's] retirement" and "even if he wished to, [the participant] could not defer distribution until his retirement"); *compare Wilson*, 930 F.3d at 432 (plan that "*allow[ed]* eligible

executive employees to defer two types of income" and in which the employees "*could choose* to defer" compensation was an ERISA plan (emphasis added)); *and Tolbert v. RBC Cap. Markets Corp.*, 758 F.3d 619, 622, 624–26 (5th Cir. 2014) (plan that permitted employees to elect to receive distribution during employment or upon separation from employment was an ERISA plan).

For all of these reasons, the Court agrees with Defendants that the LTIP is a bonus plan. The Court must next decide whether it is nevertheless subject to ERISA coverage under 29 C.F.R. § 2510.3-2(c). *See Hahn*, 99 F. Supp. 2d at 279 ("Despite the regulation excluding bonus payments from ERISA coverage, such payments may fall within the ERISA definition of employee pension benefit plans if: (1) payments are 'systematically deferred to the termination of covered employments or beyond' or (2) payments are designed for the purpose of providing retirement income." (quoting 29 C.F.R. § 2510.3-2(c))).

## II.     Whether the Bonus Exception Applies

Ms. Faris also argues that the LTIP systematically defers payments to the termination of covered employment or beyond, which would render it subject to ERISA under 29 C.F.R. § 2510.3-2(c). *See* [Doc. 39 at 4]; *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980) ("ERISA [is] applicable to some bonus plans, but only those whose payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement benefits."). "To be systematic, deferral [of payments to the termination of covered employment and beyond] must be more than mere happenstance." *Bingham v. FIML Nat'l Res., LLC*, No. 13-cv-00167-CMA-KMT, 2013 WL 3093906, at *2 (D. Colo. June 18, 2013). "Post-termination payments of bonuses may result 'incidental[ly],' though not systematically, and the plan would still be exempted from ERISA coverage." *Wilson*, 930 F.3d at 436 (alteration in original) (quoting *Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 189 (3d Cir. 2003)).

Ms. Faris contends that the LTIP systematically defers payment to the termination of covered employment and beyond because (1) the LTIP permits participants to receive distribution payments even after their employment ends, and, according to Plaintiff, defers income "beyond the termination of employment more than 50% of the time," and (2) participants lack the ability to withdraw benefits at their discretion.  [Doc. 39 at 5–7, 9–10].

The Parties agree that some LTIP participants have received distribution payments under the LTIP after the termination of their employment.  *See* [*id.* at 6–7; Doc. 45 at 5–6.  However, "[t]he mere fact that payments made pursuant to a plan continue after retirement does not transform an otherwise excluded bonus plan into one whose payments are 'systematically deferred' to the termination of employment or one whose purpose is to provide retirement income." *Hahn*, 99 F. Supp. 2d at 279.  As mentioned above, participants must generally still be employed with the Company to receive a payment on the distribution date.  [Doc. 21-13 at § 5.5].  The LTIP provides a limited number of exceptions to this requirement, permitting post-termination distribution payments if (1) the participant reaches the age of 60 or completes 30 years of service with the Company during their employment; (2) the participant's employment terminates due to death, disability, or a reduction in force; or (3) the participant is elected to Tribal Council and is sworn in prior to the distribution date.  [Doc. 21-13 at §§ 5.2, 5.5]; *see also* [*id.* at 9].

In support of her first contention, Plaintiff has submitted a spreadsheet that documents "every distribution made under the LTIP."  [Doc. 39 at 6]; *see also* [Doc. 45-2 at ¶ 1; Doc. 39-1 (the spreadsheet)].  The spreadsheet demonstrates that nearly 4,000 distribution payments have been made to LTIP participants since the LITP's implementation. *See generally* [Doc. 39-1].  Ms. Faris asserts in her Response that there are 835 different participants represented in the spreadsheet, 622 of which are no longer employed by the Company.  [Doc. 39 at 6 n.1].  She argues

that of those 622 employees, "325 of them received a distribution after their employment had already been terminated," and so it follows that "participants in the LTIP receive distributions beyond termination 52% of the time." [*Id.* (emphasis omitted)]. According to Ms. Faris, because participants receive post-termination benefits "more than half the time," the LTIP systematically defers payments to the termination of covered employment and beyond. [*Id.* at 7].

Defendants take a different position, both with respect to the specific numbers reflected in the spreadsheet and what the spreadsheet ultimately demonstrates. Defendants submit a declaration from Darrell Owen ("Mr. Owen"), the Growth Fund's finance director, who states that "[t]here are a total of 3,923 entries on the Spreadsheet (3,929 rows less . . . six voided checks)." [Doc. 45-2 at 1; *id.* at ¶ 4]. Based on his review of the spreadsheet, Mr. Owen states that "there are actually 323 entries that show distributions [made] after the Participant's employment had terminated, not the 325 referenced in Plaintiff's Response." [*Id.* at ¶ 3]. Further, disregarding entries in the spreadsheet that represent the six voided checks, three entries "where the termination date was incorrectly entered in the database," and 18 duplicate entries, there are actually only 296 employees who have received payments on or after the employee's termination date, according to Mr. Owen. [*Id.*].[4] Mr. Owen represents that, based on his review, the spreadsheet shows that there were 264 payments made to employees whose employment was terminated due to a reduction in force; ten payments made after employee had died; six payments made to employees who left due to a disability "or other similar circumstances"; and ten payments made to employees who had reached the age of 60 prior to their separation from employment. [*Id.* at ¶ 5].[5] Then, Mr. Owen

---

[4] The Owen Declaration does not specifically identify these erroneous entries. *See generally* [Doc. 45-2].

[5] The Court notes that these numbers, added together, amount to 290 employees, not 296 employees.

concludes that—based on 296 of 3,923 data entries—only 7.6% of the distribution payments that have been made under the LTIP were made after the participant's employment was terminated. [*Id.* at ¶ 4];[6] *see also* [Doc. 45 at 6 (Defendants arguing that "only 7.6% of the more than 3,900 distributions made under the LTIP involve payments made after an employee has terminated employment under the LTIP exceptions.")].

The Court has conducted an independent review of the spreadsheet,[7] which makes clear that the vast majority of distribution payments that have been made since the LTIP's implementation—over 90 percent—have been made to LTIP participants *during* their employment. This is consistent with the LTIP's general requirement that, to be eligible to receive a distribution payment, the participant must be employed by the Company on the distribution date. To receive a distribution payment *after* the termination of covered employment, some condition precedent (a reduction in force; the employee's death, disability, or election to Tribal Council; or the employee reaching the age of 60 or 30 years of service during their employment) must occur. But there is no guarantee that any such event will occur for any given participant or that any given

---

[6] Mr. Owen does not explain why he reduced the total number of data entries to account for the six voided checks, but not for the "duplicate entries or data entry errors." [Doc. 45-2 at ¶¶ 3–4].

[7] The Court has independently reviewed the spreadsheet and based on the Court's calculations, it appears that post-termination distribution payments were made to non-employees approximately 289 times: nine post-termination distribution payments were made to employees who were paid due to having reached the age of 60 during their employment, [Doc. 39-1 at 7, 11, 46, 49, 51–52, 54–55]; six post-termination payments were made employees who separated from employment due to disability, [*id.* at 3, 47, 50, 64–65]; ten post-termination distributions were made to employees who died, [*id.* at 5, 16, 23, 38, 40, 42, 47, 48, 54]; and 264 post-termination payments were made to employees whose employment ended due to a reduction in force, [*id.* at 3, 7, 12–13, 16–19, 21–25, 30, 32, 34, 36, 39, 40–43, 45, 48, 52, 56, 58, 63–68]. In addition, there appear to have been a few other unexplained payments made to participants after their employment had ended, *see, e.g.*, [*id.* at 8, 11, 15, 35–37, 45, 48–49], although at least a few of these payments may contain the errors referenced by Mr. Owen. *E.g.*, [*id.* at 35–37 ll. 2014, 2075, 2138 (providing a termination date predating the employee's start date)]. Although this Court's calculations do not mirror Plaintiff's or Defendants' calculations, the negligible differences do not affect the Court's analysis.

participant will, in fact, receive payments after their employment has ended. Thus, any post-termination distributions are the result of "happenstance," not the systematic deferral of payment to the termination of employment or beyond. *Wilson*, 930 F.3d at 436.

Indeed, the LTIP does not condition payments on a participant's retirement or termination of employment. *Compare* [Doc. 21-13], *with Bingham*, 2013 WL 3093906, at *3 ("By [the plan's] express terms, post-employment disbursement of payments is more than mere happenstance; some payments are withheld until termination, and then awarded automatically, as a matter of course." (quotation omitted)). In fact, a participant could be paid the entirety of her account balance upon completing 30 years of service with the Company or reaching the age of 60, *without* leaving her employment. *See* [Doc. 21-13 at § 5.2]; *see also, e.g.*, [Doc. 39-1 at 60, ll. 3461–62 (the spreadsheet reflecting this scenario)]. If anything, in this scenario, the LTIP systematically defers payments to participant-specific milestones, not to the termination of employment. *Cf. Killian*, 850 F. Supp. at 1246 (concluding that a benefits plan "was not designed to provide an employee with retirement benefits because the employee would receive the benefits regardless of whether or not he or she had retired"). In contrast, as discussed above, the LTIP also expressly contains a forfeiture provision: if the participant is no longer employed by the Company on the distribution date, absent the noted exceptions, all amounts in the participant's account are forfeited. [Doc. 21-13 at §§ 5.1, 5.5]. Payments cannot be systematically deferred to the termination of employment if the voluntary termination of employment eliminates the participant's ability to receive those payments. *Cf. Timian v. Johnson & Johnson*, No. 6:15-cv-06125 MAT, 2015 WL 6454766, at *4 (W.D.N.Y. Oct. 26, 2015) (finding that a plan did not defer income to the termination of employment and beyond, and was not an ERISA pension plan, where it stated that if the employee was no longer employed by the company on the vesting date, their stock-unit benefits would be

null and void).  Thus, while Plaintiff argues that the LTIP systematically defers payments because the LTIP "is devoid of any participant discretion and instead is designed as a systemic deferral of income based upon factors outside the participant's control," *see* [Doc. 39 at 9], the LTIP's set payment schedule does not render its payments systematically deferred *to the termination of covered employment or beyond.  See Jeffrey v. Am. Ventures Realty Invs., Inc.*, No. 08-22818-CIV, 2009 WL 10701431, at *9 (S.D. Fla. July 28, 2009) ("The existence of a vesting schedule does not automatically result in a systematic deferral of income.").

Finally, although Plaintiff urges the Court to compare the total number of formerly employed participants to the number of formerly employed participants who received post-termination payments and find that the LTIP results in post-termination payments over half the time, *see* [Doc. 39 at 6 n.1], the Court respectfully disagrees with Plaintiff's position as to what the spreadsheet shows.  The spreadsheet reflects that these post-termination payments have overwhelmingly been the result of various reductions in force.  *See, e.g.*, [Doc. 39-1 at 17–18, 65–67].  The Court finds these post-termination distributions are more attributable to the Company's business decisions to eliminate jobs than to the design of the LTIP itself, and for the reasons explained above, the spreadsheet does not support a finding that the LTIP *systematically* defers payments to the termination of employment and beyond.

For these reasons, the Court cannot conclude that the LTIP "systematically defers payments to the termination of covered employment and beyond," as required for ERISA coverage under 29 C.F.R. § 2510.3-2(c).  Because the LTIP is excluded from ERISA coverage, ERISA does not govern Plaintiff's claims.  And because Plaintiff asserts no other basis for this Court's jurisdiction over the case, the Court must dismiss this action for lack of subject matter jurisdiction.  The Motion to Dismiss is respectfully **GRANTED**.

**CONCLUSION**

For the reasons set forth herein, **IT IS ORDERED** that:

(1)     Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1) for Lack of Subject Matter Jurisdiction [Doc. 21] is **GRANTED**;

(2)     Plaintiff's claims are **DISMISSED without prejudice** for lack of subject matter jurisdiction;

(3)     Defendants are awarded their costs under Federal Rule 54 and Local Rule 54.1; and

(4)     The Clerk of Court is directed to close this case.

DATED:  November 8, 2023                          BY THE COURT:

_____
Nina Y. Wang
United States District Judge